ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2.5.07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FOR PUBLICATION

TIME WARNER CABLE, INC.,

                Plaintiff,

      -against-

DIRECTV, INC.,

                  Defendant.

No. 06 Civ. 14245 (LTS)(MHD)

## OPINION

APPEARANCES:

PATTERSON, BELKNAP, WEBB &
TYLER
  By: Saul B. Shapiro
      Sarah E. Zgliniec
      Scott W. Parker
      Richard Jackson
      Karen Lim
1133 Avenue of the Americas
New York, NY 10036

QUINN EMANUEL
  By: Michael E. Williams
865 S. Figueroa St., 10th Flr.
Los Angeles, CA 90017

    -and-

    Marc L. Greenwald
    Jessica Rose
51 Madison Avenue, 22nd Floor
New York, NY 10010

*Attorneys for Plaintiff*

*Attorneys for Defendant*

LAURA TAYLOR SWAIN, United States District Judge

Copies mailed   picked up   2.5.07
Chambers of Judge Swain

issues material to its determination of the pending motion, are as follows. TWC is the second-largest cable provider in the United States. In the areas of New York City in which TWC is the franchisee, an overwhelming majority of cable subscribers subscribe to TWC. (Declaration of Sam Howe in Support of Plaintiff's Motion for a Preliminary Injunction ("Howe Decl.") ¶¶ 8, 9.) TWC offers both analog and digital cable television services to its subscribers, whereas DIRECTV offers 100% of its programming digitally. (Howe Decl. ¶ 3, Declaration of Giles S. Lundberg in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Lundberg Decl.") ¶ 3.) TWC and DIRECTV broadcast only a limited number of their respective channels in high-definition ("HD") format. (Lundberg Decl. ¶3.) To receive HD programming, customers of either service must have high definition television equipment. (Howe Decl. ¶ 6.)

According to Advanced Television Systems Committee ("ATSC"), a non-profit organization that develops voluntary standards for digital television, including HDTV, the screen resolution must be either 720p, 1080i, or 1080p to qualify as HD.[1] (Declaration of Ronald E. Boyer in Support of Plaintiff's Motion for Preliminary Injunction ("Boyer Decl.") ¶¶ 4-5.) The higher the "i" or "p" number, the better the resolution. (Id.) Providers such as TWC and DIRECTV do not set the screen resolution for HDTV programming, but instead make available sufficient bandwidth to permit the relevant level of resolution to pass to customers. (Id. ¶ 6.) Therefore, both TWC and DIRECTV have the same picture quality when it comes to HD programming. With respect to non-HD service, the record establishes that analog cable service is inferior in certain respects to digital cable service, in part because a digital cable signal is less prone to corruption than an analog cable signal. (Id. ¶ 13.)

---

[1]     The "p" and "i" designations stand for "progressive" and "interlaced."

On November 26, 2006, counsel for TWC contacted counsel for DIRECTV

regarding various DIRECTV advertisements, including, a commercial featuring the singer and

actress Jessica Simpson ("the Original Simpson Commercial"), and a commercial featuring the

actor William Shatner ("the Original Shatner Commercial"). (Declaration of Michael Williams

in Opposition to Plaintiff's Motion for Preliminary Injunction ("Williams Decl.") ¶ 2; Declaration

of Saul B. Shapiro in Support of Plaintiff's Motion for a Preliminary Injunction ("Shapiro Decl.")

¶ 2.)

In the Original Simpson Commercial, which began running on October 25, 2006,

Ms. Simpson, playing the character of Daisy Duke that she portrayed in the movie The Dukes of

Hazzard, stated in relevant part: "Hey, 253 straight days at the gym to get this body and you're

not going to watch me on DIRECTV HD? You're just not going to get the best picture out of

some fancy big screen TV without DIRECTV. It's broadcast in 1080i. I totally don't know what

that means but I want it." A narrator's voice then concluded, "for picture quality that beats cable,

you've got to get DIRECTV." (Declaration of Jon T. Geiselman in Opposition to Plaintiff's

Motion for a Preliminary Injunction ("Geiselman Decl.") ¶¶ 16-17.)

In the Original Shatner Commercial, which began running on October 7, 2006,

Mr. Shatner, playing the character of Captain James T. Kirk that he portrayed in the Star Trek

television series and movies, stated in relevant part: "I wish he'd just relax and enjoy the amazing

picture clarity of the DIRECTV HD we just hooked up. With what Starfleet just ponied up for

this big screen TV, settling for cable would be illogical." A narrator's voice concluded, "for

picture quality that beats cable, you've got to get DIRECTV." (Id. ¶¶ 29-30.)

Counsel for both TWC and DIRECTV spoke numerous times over the

Thanksgiving weekend to attempt to resolve TWC's issues with the contested advertisements. The parties focused their discussions on the Original Simpson Commercial, the Original Shatner Commercial, and other advertisements that are not relevant to this motion practice. (Williams Decl. ¶¶ 3-7; Shapiro Decl. ¶¶ 3-5.) On November 28, 2006, counsel for DIRECTV informed counsel for TWC that it would no longer run the Original Shatner Commercial. (Shapiro Decl. ¶ 5.) On November 29, 2006, counsel for DIRECTV informed counsel for TWC that it would immediately take steps to stop running the Original Simpson Commercial. (Id.; Williams Decl. ¶ 7.) The Original Simpson Commercial ran through approximately December 3, 2006. (Shapiro Decl. ¶ 8; Gieselman Decl. ¶ 27.)

Both the Simpson and the Shatner commercials were revised. A revised Simpson commercial ("the Revised Simpson Commercial"), which began airing on some networks sometime in early December 2006, is identical to the Original Simpson Commercial, with the exception that the narrator's closing line has been changed to "for an HD picture that can't be beat, get DIRECTV." (Howe Decl. ¶ 19.) A revised Shatner commercial (the "Revised Shatner Commercial"), which began running on January 1, 2007, is identical to the original Shatner commercial, with the exception that the narrator's closing line has been changed to "for an HD picture that can't be beat, get DIRECTV." (Gieselman Decl. ¶ 31.)

On December 7, 2006, TWC filed the Complaint in this action. (Shapiro Decl. ¶ 10.) In a Stipulation and Order filed with the Court on December 11, 2006, and so-ordered by the undersigned on December 12, 2006, Defendant agreed, among other things, not to claim that its HDTV service was superior to that offered by TWC or any other cable provider. The parties further stipulated that any breach of the Stipulation would constitute irreparable harm to TWC.

(Stip. ¶ 3.) An Amended Complaint was filed on January 17, 2007.

In addition to seeking an injunction barring the broadcast of the above-mentioned television commercials, TWC seeks a prohibition barring the display of certain advertisements on the internet, namely a website demonstrative featuring NFL player Kevin Dyson and two so-called "banner ads," one of which depicts women snorkeling underwater and the other of which depicts NFL player Eli Manning. (Gieselman Decl. ¶¶ 34, 36; Howe Decl. ¶¶ 24-26). In both the website demonstrative and both versions of the banner ads (collectively, "the Internet Advertisements"), the image is divided into two screens by a white line. One half is a clear picture labeled "DIRECTV" and the other half is an extremely blurry, highly pixellated and indistinct image labeled "OTHER TV." (Gieselman Decl. ¶ 34; Howe Decl. ¶¶ 24-26.) In the website demonstrative, text eventually appears that reads, in part, "[i]f you're hooking up your high-definition TV to basic cable, you're not getting the best picture on every channel. For unparalleled clarity, you need DIRECT TV HD." (Gieselman Decl. ¶ 36; Howe Decl. ¶¶ 24.) In the banner ads, text eventually appears that reads, in part, "[f]ind out why DIRECTV's picture beats cable." (Howe Decl. ¶ 25.) The record in connection with this motion practice also includes an audio advertisement depicting cable's audio signal as distorted and interrupted or inconsistent. (Howe Decl. Exh. F.)

## Analysis

TWC seeks an injunction barring, among other thing, dissemination of the Revised Simpson Commercial, the Revised Shatner Commercial, and the Internet Advertisements. TWC contends that the commercials falsely represent that DIRECTV's HD

service is superior to cable's, and that the Internet Advertisements falsely depict cable TV images as unwatchably blurry or pixellated.  Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a) (West 2006),[2] which establishes a federal cause of action for false advertising, provides, in relevant part, that:

> (1) [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce . . . false or misleading description of fact, or false or misleading representation of fact, which . . . (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

A party seeking preliminary injunctive relief must show that it will suffer irreparable harm in the absence of the relief, and either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in the moving party's favor.  See Procter & Gamble Co. v. Chesebrough-Pond's, Inc., 747 F.2d 114, 118 (2d Cir. 1984).  "To obtain permanent injunctive relief against a false or misleading advertising claim pursuant to section 43(a), a plaintiff must demonstrate by a preponderance of the evidence that an advertisement is either literally false or that the advertisement, though literally true, is likely to mislead and confuse consumers. . . .  Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public."  McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1548-49 (2d Cir. 1991)

---

[2]     Because, as the parties acknowledge, the standards for analysis of Plaintiff's New York state law claims are the same as those for analysis of the Lanham Act claims in all relevant respects, the following discussion is equally applicable to both sets of claims. See Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221 F. Supp. 2d 410, 413 n. 2 (S.D.N.Y. 2002); Novo Nordisk A/S v. Becton Dickinson and Co., 997 F. Supp. 470, 472 n. 1 (S.D.N.Y. 1998).

(internal quotation marks and citation omitted). Here, Plaintiff claims that the challenged advertisements are literally false, and bears the burden of demonstrating that it is likely to succeed on this claim in order to obtain a preliminary injunction.[3] In considering false advertising claims, the Court is to bear in mind that "fundamental to any task of interpretation is the principle that text must yield to context," and that the Court must "consider the advertisement[s] in [their] entirety and not engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately." S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001).

In addition to establishing a likelihood of success on the merits, the Plaintiff must demonstrate the prospect of irreparable harm in order to obtain an injunction. In false advertising cases, courts will presume irreparable harm where the moving party "demonstrates a likelihood of success in showing literally false defendant's comparative advertisement which mentions plaintiff's product by name." Castrol, Inc. v. Quake State Corp., 977 F.3d 57, 62 (2d Cir. 1992). Accordingly, the Court will begin by analyzing Plaintiff's argument that each of the contested advertisements is literally false.

Success on the Merits - Literal Falsity

*The Revised Simpson Commercial*

Defendant argues that Plaintiff cannot meet its burden of showing the likelihood

---

[3]     Neither party addressed in its briefs the issue of whether or not Plaintiff could establish that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in Plaintiff's favor rather than establishing a likelihood of success on the claims. Because the Court, for the reasons that follows, finds that Plaintiff has met its burden of demonstrating that it is likely to succeed on the merits of the relevant claims, it need not also consider whether there are sufficiently serious questions going to the merits and a balance of hardships tipping in Plaintiff's favor.

of success as to its literal falsity claim because none of the individual statements offered by Ms. Simpson or by the narrator of the commercial is literally false. Specifically, Defendant proffers that the statements "[y]ou're just not getting to get the best picture out of some big fancy big screen TV without DIRECTV," and "[f]or an HD picture that can't be beat, get DIRECTV" are not false, because the first statement "refers to the overall picture quality of DIRECTV on all of its channels since that is the only way to determine whether a consumer is getting the most out of their television" (Def. Mem. L. in Opp. 11), and because the second statement is true, in that, as the record establishes, DIRECTV and TWC do indeed provide the same quality of HD broadcasts. Defendant's analysis, which relies on the sort of "disputatious dissection" criticized by the Second Circuit in SC Johnson & Son, is flawed.

Under the law of this Circuit, an advertisement is to be viewed as a whole, and its statements assessed in context. Viewed in such manner, the Revised Simpson Commercial is clearly one focused on HD service quality. The commercial opens with Ms. Simpson admonishing the viewer that the physical results of her time spent in the gym are best viewed on DIRECTV **HD**, stating that a viewer would not "get the best picture" without DIRECTV, and continuing on to note that DIRECTV is broadcast in **1080i**, which is an HD broadcast format. The commercial ends with a narrator advising that, "[f]or an **HD** picture that can't be beat, get DIRECTV." (Emphasis added in all.) DIRECTV's argument that this commercial is not about DIRECTV's HD capabilities but is instead referring to the "overall picture quality" of DIRECTV strikes the Court as disingenuous at best, especially in light of the fact that the commercial only makes reference to HD capability and not to any of DIRECTV's other services. The commercial's assertion that a viewer cannot "get the best picture" without DIRECTV is therefore

likely to be proven literally false, in that the undisputed factual record here establishes that

DIRECTV and TWC provide HD pictures of equal quality.  Plaintiff has thus met its burden of

showing a likelihood of success on its claim that the commercial, viewed as a whole, refers to

DIRECTV's HD programming, and that it makes the literally false statement that DIRECTV's

HD programming is superior to that of TWC.[4]

    *The Revised Shatner Commercial*

      Similarly, Plaintiff has met its burden of proving a likelihood of success on its

claim that the Revised Shatner Commercial, when viewed as a whole, relates to DIRECTV's HD

programming and makes the literally false statement that DIRECTV's HD programming is

superior to that of TWC.  In the commercial, Mr. Shatner praises the "amazing picture quality of

the DIRECTV **HD**" that is hooked up to his ship, and asserts that "settling for cable would be

illogical."  A narrator then concludes: "[f]or an **HD** picture that can't be beat, get DIRECTV."

(Emphasis added in all.)  For it to be illogical for a consumer to "settle" for cable's HD services,

cable's HD services must, in some material respect, be inferior to those of DIRECTV.  Viewing

the commercial as a whole, rather than examining each line in a vacuum, Plaintiff has met its

burden of proving a likelihood of success on its claim that the commercial focuses on

DIRECTV's HD programming, and that it makes the literally false statement that DIRECTV's

HD programming is superior to that of TWC.

---

[4]    Defendant also argues that Plaintiff is equitably estopped from challenging the revised Simpson commercial, contending that "TWC approved the very portions of the ad it now complains about." (Def. Mem. Opp. 17.)  The Court finds that this argument is not supported by the record.  Nothing in Defendant's proffers demonstrates Plaintiff's prior approval of the challenged advertisement.  Indeed, there is no evidence that Defendant even told Plaintiff what language would be utilized in the revised commercial, or that Defendant obtained Plaintiff's blanket consent to any future revisions.

*The Internet Advertisements*

Plaintiff has also met its burden of establishing a likelihood of success on its claim that the Internet Advertisements at issue are literally false. In S.C. Johnson, the Second Circuit made clear that a court is to "look[] to the visual images in [an advertisement] to assess whether it is literally false." S.C. Johnson, 241 F.3d at 238 (citation omitted.) There, the district court had found that the challenged commercial "impermissibly exaggerate[d] the facts" with respect to how quickly water would flow out of a competitor's plastic food storage bag. Id. at 235 (citing to the district court opinion). Viewing the "overall depiction of the commercial itself," the district court determined that the commercial "misrepresented" the product and was literally false. Id. The S.C. Johnson & Sons district court noted that "[t]he problem with the commercial is that there is no depiction in the visual images to indicate anything else than the fact that [the rate and amount of water shown leaking] is simply characteristic of that kind of bag." Id. The Second Circuit affirmed the district court's finding of literal falsity and grant of injunctive relief.

Here, the Defendant acknowledges that the Internet Advertisements exaggerate the purported imprecision of the "Other TV" images and, indeed, argue the advertisements constitute non-actionable "puffery" that no consumer would rely upon. Cf. Coastal Communications Corp. v. Adams/Laux Co., Inc., No. 96 Civ. 1369 (JSM), 1996 WL 546880, at *1 (S.D.N.Y. Sept. 26, 1996) (holding that non-actionable puffery "involv[es] outrageous generalized statements, not making specific claims, that are so exaggerated as to preclude reliance by consumers") (internal quotation marks and citation omitted). This argument fails. Although Defendants argue that the pictures are so distorted that "none of TWC's customers, or

other consumers, most of whom probably have had or at least have seen cable television at some point in their lives, would reasonably believe that the picture offered by cable television is generally [as distorted as the pictures in the contested advertisements]" (Def. Opp. Mem. 22), this position is belied by Defendant's own acknowledgment that many HDTV equipment purchasers are confused as to what image quality to expect when viewing non-HD broadcasts, as their prior experience with the equipment is often limited to viewing HD broadcasts or other digital images on floor model televisions at large retail chains. (Id. 13.)  In these circumstances, consumers unfamiliar with HD equipment could be led to believe that using an HD television set with an analog cable feed might result in the sort of distorted images showcased in DIRECTV's Internet Advertisements, especially since those advertisements make reference to "basic cable."

The authorities cited by Defendant in support of its "puffery" argument do not suggest that a finding of mere "puffery" would be appropriate here.  In Coastal Communications, for instance, the contested advertising included statements such as "[t]hank you for reading the only meeting industry publication devoted exclusively to your needs as a planner and organizer of corporate meetings," and "[b]uy Real Targets . . . The only niche titles in the growing meetings and incentive travel field . . . ".  Id.  The first statement was held to be puffery because it touted customization of a free, mass-mailed publication to an individual reader's needs.  The individual readers had personal knowledge of their own needs and of circumstances under which they were receiving the publication, and thus that the claim was mere puffery.  Id.  The false advertising cause of action was sustained as to the second claim, which made a false representation that defendant's titles were the only ones available in a particular market.  The court thus left for the jury the question of whether a "reasonable consumer would interpret . . .

[the] advertisement as a factual claim upon which he or she could rely." Id. at *2.

        The record here is sufficient to demonstrate a likelihood of success in proving that, in the relatively new world of HDTV equipment, new buyers may not have sufficient knowledge of the way in which HDTV sets operate to recognize as false DIRECTV's distorted image depiction. As in the S.C. Johnson case, part of the problem with the contested Internet Advertisements is that nothing in the text or images suggests that the grossly distorted picture quality depicted in the advertisements is not characteristic of cable service. TWC has met its burden of establishing a substantial likelihood of success on its claim that the Internet Advertisements are literally false.

Irreparable Harm

        As noted above, courts will presume irreparable harm where the moving party "demonstrates a likelihood of success in showing literally false defendant's comparative advertisement which mentions plaintiff's product by name." Castrol, 977 F.3d at 62. Defendant here argues that, even if Plaintiff succeeds in demonstrating a likelihood of success on its literal falsity claims, Plaintiff is not entitled to the presumption of irreparable harm because the contested advertisements did not mention Plaintiff's product by name.

        In McNeil-PPC, Inc. v. Pfizer Inc., 351 F. Supp. 2d 226 (S.D.N.Y. 2005), Judge Chin found that although the contested advertisements did not mention plaintiff's product by name, application of the irreparable harm presumption was appropriate because they were comparative advertisements, plaintiff was the "market leader" in the field with 40% or more of the sales, and the advertisement depicted a container "similar if not identical to" Plaintiff's

container. Id. at 250. The Court finds Judge Chin's reasoning persuasive and further finds the instant circumstances appropriate for application of the presumption. Although, as Defendant points out, TWC serves only 19.5% of the cable market in the United States as a whole, TWC is the primary cable provider in each market in which it operates. TWC is thus the direct competitor of DIRECTV in those markets. Therefore, the explicit references to "cable" in both the revised Shatner commercial and the internet advertisements are, as a practical matter, references to TWC with respect to any market in which both parties have a presence, and TWC is entitled to the presumption of irreparable harm under Castrol.

TWC is also entitled to the presumption of irreparable harm with respect to the Revised Simpson Commercial, which does not explicitly reference cable. As explained above, when viewed as a whole, the commercial touts DIRECTV's HD broadcasts as superior to HD broadcasts on cable. TWC is DIRECTV's main competitor in markets served by TWC. Thus, the commercial effectively makes a direct comparison to TWC's service, and TWC is entitled to the presumption of irreparable harm regarding the revised Simpson commercial.[5]

### The Scope of the Injunction

As discussed above, Plaintiff has met its burden of establishing that it is entitled to a preliminary injunction barring dissemination of the contested advertisements. Federal Rule of Civil Procedure 65 requires that an injunction be "specific in terms" and "describe in

---

[5]    As noted above, under the terms of the Stipulation and Order entered into by the parties and so ordered by this Court on December 12, 2006, the parties agreed that any breach of the terms of that Order would "constitute irreparable harm to Time Warner Cable." (Stip. ¶ 3.) The record here supports a finding that the stipulation was, in fact, breached, as several of the contested commercials continued to run well after it had been so ordered. This fact also supports a finding of irreparable harm.

reasonable detail . . . the . . . acts sought to be restrained." A court must be mindful that it not restrain conduct that is not inappropriate.

Defendant objects to Plaintiff's revised proposed preliminarily injunction as unconstitutionally overly broad, as it would potentially enjoin commercial speech that is not false, and also as vague, as it would enjoin not only the contested advertisements but also any advertisements that are "substantially similar" to them, and because it would enjoin DIRECTV from making any implication that TWC's overall cable services are in some way inferior to those of DIRECTV.

The proposed order is indeed overly broad and vague in material respects. The "substantially similar" language, in view of the potentially huge number of combinations of words, phrases, pictures and gestures that might be used in advertising, is insufficient to describe the act to be restrained. As discussed on the record during oral argument, the "substantially similar" language will be replaced with language prohibiting "any other advertisement disparaging the visual or audio quality of TWC or cable high-definition television ("HDTV") programming as compared to that of DIRECTV or satellite HDTV programming," in relation to the television commercials, and with language prohibiting "any other advertisement making representations that the service provided by Time Warner Cable, or cable service in general, is unwatchable due to blurriness, distortion, pixellation or the like, or inaudible due to static or other interference" in relation to the Internet Advertisements.

The Court will not that prohibit DIRECTV from engaging in comparative advertising stating that its overall picture quality is superior to that of TWC's in material respect, as the record does not establish the falsity of the proposition that DIRECTV's all-digital service,

taken as a whole, is superior to cable's mix of digital and analog.  The Court will also limit the geographical scope of the injunction to areas TWC provides cable service.

Finally, Plaintiff in its moving papers asks the Court to include a requirement that DIRECTV engage immediately in corrective advertising as part of the preliminary injunction.  Its reply papers do not renew this request, and the request was not mentioned at oral argument.  To the extent that Plaintiff has not withdrawn its request that Defendant be required to promulgate corrective advertising, that request is denied.  In fashioning relief, "the court has broad discretion to determine the appropriate remedy."  National Geographic Society v. Conde Nast Publications, 687 F. Supp. 106, 110 (S.D.N.Y.1988).  The Court does not believe that the extraordinary relief of corrective advertising is warranted in this case, and finds that the injunctive relief granted is adequate and appropriate.

Conclusion

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is granted to the extent set forth in the accompanying Order Granting Preliminary Injunction Motion.

Dated: New York, New York
         February 5, 2007

LAURA TAYLOR SWAIN
United States District Judge